FILED

08/27/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 6, 2021 Session

**STATE OF TENNESSEE v. WILL VAUGHN**

**Appeal from the Criminal Court for Shelby County**
**Nos. 18-04092, 18-04093   John Wheeler Campbell, Judge**

_____

**No. W2020-00366-CCA-R3-CD**

_____

In a consolidated trial of Case No. 18-04092 and Case No. 18-04093, a Shelby County jury convicted Will Vaughn ("Defendant") of fifteen counts of Class C felony facilitation of attempted second degree murder, fifteen counts of Class C felony employing a firearm during the commission of a dangerous felony, and two counts of Class A misdemeanor facilitation of reckless endangerment with a deadly weapon.  The trial court sentenced Defendant to six years for each of the thirty felony counts and to eleven months and twenty-nine days for each count of facilitation of reckless endangerment counts.  The trial court aligned some convictions concurrently and others consecutively in each case.  At the sentencing hearing, the trial court stated that it was imposing an effective thirty-year sentence in Case No. 18-04092 and an effective thirty-year sentence in Case No. 18-04093 and ordered the two sentences to be run consecutively for a total effective sentence of sixty years. The "special conditions" section of the thirty-two judgment forms signed by the trial court state that the total effective sentence is fifty-four years.  Also, the judgment forms for some of the counts do not match the consecutive/concurrent alignment announced by the trial court.  On appeal, Defendant argues that the evidence was insufficient to support his convictions and that the trial court erred by imposing consecutive sentencing.  After a thorough review, we affirm the convictions and consecutive sentencing but remand for trial court resentencing in two counts and for entry of the proper judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

William Price Rudolph, Memphis, Tennessee, (on appeal), and John Dolan, Memphis, Tennessee, (at trial), for the appellant, Will Vaughn.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Will Muller and Jennifer Morris, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## <u>Factual and Procedural History</u>

This case arises from two shooting incidents which occurred roughly four hours apart in the early morning of March 9, 2018. The two co-defendants, Brooke Lurry and Termeria Harris, asked Defendant for assistance regarding a feud with a former roommate, Alexis Hammond. At approximately 2:00 a.m., the three co-defendants drove to Ms. Hammond's residence, and Defendant shot multiple bullets through the windows and walls of the home. Ms. Hammond and her friends then left her residence and went to a second residence. Shortly after their arrival at the second residence at approximately 6:00 a.m., the three co-defendants also arrived, and Defendant again shot multiple bullets through the second residence.

In two separate indictments, which were consolidated at trial, the Shelby County Grand Jury indicted Defendant and two co-defendants with fifteen counts of attempted first degree murder, fifteen counts of employing a firearm during the commission of a dangerous felony, and two counts of reckless endangerment by discharging a firearm into an occupied habitation. Defendant was the only one of the three co-defendants to go to trial. Co-Defendant Harris pled guilty and testified at Defendant's trial. The disposition of Co-Defendant Lurry's case is not clear from the record.

Following trial, a jury convicted Defendant of fifteen counts of facilitation of attempted second degree murder (as lesser included offenses of attempted first degree murder), fifteen counts of employing a firearm during the commission of a dangerous felony (which dangerous felony the jury specified as attempted second degree murder), and two counts of facilitation of reckless endangerment committed with a deadly weapon (as lesser included offenses of reckless endangerment committed with a deadly weapon).[1]

*Trial*

Alfred Bates testified that he and his wife, Larrystine Bates, lived on Navaho Avenue in Memphis on March 9, 2018. Mr. Bates stated that there were eleven people,

---

[1] The verdict form did not include an option for the jury to find Defendant guilty of the indicted offence of reckless endangerment by discharging a firearm into an occupied habitation.

including six of his grandchildren, in the Navaho Avenue residence when, at approximately 2:00 a.m., someone "shot up [his] house." He said shots were fired from two different directions. Mr. Bates said that he heard at least twelve shots and that at least one shot went through the house and hit his neighbor's home. He recalled that one of the bullets passed inches from his head and left debris on one of his grandchildren. Mr. Bates testified that his granddaughter, Ashley Moore, had two friends spending the night and that her friends were sleeping on the couch. He said that five bullets came through the living room and that one came through the window approximately two feet above the couch. Mr. Bates said that he did not see who shot into his house and that he had never seen Defendant before trial.

Larrystine Bates testified that, around 10:00 p.m. on March 8, 2018, she took one of her grandchildren to the hospital with an earache and that they returned to their home on Navaho Avenue at approximately 2:00 a.m. on March 9, 2018. Mrs. Bates recalled that, within thirty minutes of arriving home, she was lying in bed when someone shot into her house "more than five or six" times. She recalled that she pushed her husband out of bed because he was sometimes difficult to wake. Mrs. Bates said that she, Mr. Bates, and their granddaughters remained on the floor until the police arrived. She stated that bullets came through the window right over their heads. Mrs. Bates said that she did not see who shot into her house and that she had never seen Defendant before trial.

Ashley Moore testified that she was living at the Navaho Avenue residence on March 9, 2018, and that she was pregnant at the time. She stated that she heard shooting in the house during the night. Ms. Moore said that she did not look out of a window and did not see who shot into the house. She said that one bullet came through the wall of her room.

Erica Bates testified that she and her five children -- Ashley Moore, Alexis Hammond, and her three minor children -- all lived with her parents, Mr. and Mrs. Bates, at the Navaho Avenue residence. Although she was not present in the home at the time of the March 9, 2018 shooting, her five children were.

Ms. Bates stated that Co-Defendant Harris and Ms. Bates's daughter, Ms. Hammond, had been friends "at first." During the day on March 8, 2018, Co-Defendants Harris and Lurry knocked on the door of the Navaho Avenue residence. When Ms. Bates opened the door, Co-Defendant Harris told Ms. Bates that she wanted to fight Ms. Hammond "one-on-one." Ms. Bates said she noticed a third person sitting in the back seat of Co-Defendant Harris's silver Dodge Avenger. She stated, "The guy was slumped down a little bit in the seat where I could see his shoulders and forehead, and he had like a purple bandana around his mouth. And I saw like tattoos on the face." Ms. Bates told Co-

- 3 -

Defendants Harris and Lurry to leave the property, and they did. At trial, Ms. Bates identified the person in the car as Defendant.

On cross-examination, Ms. Bates agreed that the Dodge Avenger was approximately twenty to twenty-five feet away from her when she saw Defendant and that the purple bandana was covering Defendant's nose.

Alexis Hammond testified that Co-Defendant Harris was her former friend and roommate and that Co-Defendant Harris had previously visited in Mr. and Mrs. Bates's home. Ms. Hammond got into a fight with Co-Defendant Harris and moved out early in 2018, before the shooting. According to Ms. Hammond, after the fight,"[Co-Defendant Harris's] mom kept calling us saying they want a rematch and stuff. Then everybody just -- we'[d] do something to them, then she'[d] come back and do something to us[]." A Facebook live video, recorded approximately twelve hours before the shooting, was played for the jury. In the video, Co-Defendants Harris and Lurry asked Ms. Bates for Ms. Hammond's location and said that they wanted to hurt Ms. Hammond and that they had guns.

Ms. Hammond recalled that, on the night before the shooting, she and Ms. Bates took her daughter, P.H., to the hospital. She said that within an hour of when they returned to the Navaho Avenue residence, the house was "shot up" and there was "shattered glass, bullet holes through the house." After the police arrived, she, Ms. Tyler, and Ms. Barnes left and went to Ms. Tyler's house on Fox Lair Avenue. Ms. Hammond said that, shortly after they arrived at the Fox Lair Avenue residence at about 4:00 or 5:00 a.m., she heard "gunshots coming through the house." She said that she; Ms. Barnes; Ms. Tyler; Ms. Tyler's two minor children; Ms. Tyler's uncle, "Terry;" and a friend were all in the house at the time. She said that the bullets came through "Uncle Terry's" room on the second floor and also through a downstairs window.

On cross-examination, Ms. Hammond agreed that she did not know who or how many people were involved in the two shootings at Navaho Avenue and Fox Lair Avenue. Ms. Hammond said that, in the Facebook live video from Co-Defendant Lurry's Facebook page, Defendant's name was "tagged." The trial court asked Ms. Hammond what it meant to be "tagged" on Facebook, and she responded: "Tagged as in mentioning someone else's name that's [] around. Some people just tag others in videos just because."

Alancia Tyler testified that Ms. Hammond and Ms. Barnes were her best friends. She said that, in March of 2018, she lived on Fox Lair Avenue and that, on the night of March 8-9, 2018, she was staying at Mr. and Mrs. Bates's house and sleeping on the couch, along with Ms. Barnes. Ms. Tyler recalled that she was awakened by shots and that she pulled Ms. Barnes onto the floor with her. She stated that, if she and Ms. Barnes had been

sitting up on the couch, they would have been hit by bullets. She said that she never looked outside and that they stayed on the floor until she no longer heard shooting.

Ms. Tyler said that, after the police arrived and she gave her statement, she went to her home on Fox Lair Avenue to be with her children, who were being watched by her Uncle Terry. She said that she, Ms. Hammond, and Ms. Barnes arrived at her home on Fox Lair Avenue as the sun was coming up but that it "was still dark outside." Ms. Tyler, Ms. Hammond, and Ms. Barnes were upstairs with the children when Ms. Tyler heard shots. She recalled that her children were screaming and that she grabbed them. Ms. Tyler stated that she never looked outside during the shooting at either home.

Aniya Barnes testified that she was with Ms. Hammond and Ms. Tyler on March 8-9, 2018, and that they spent that night at Mr. and Mrs. Bates's house on Navaho Avenue. She said that "a lot" of shots came through the house that night. Ms. Barnes explained that she, Ms. Hammond, and Ms. Tyler then left and went to Ms. Tyler's house on Fox Lair Avenue as the sun was coming up on March 9, 2018. Ms. Barnes recalled that several shots were fired into the Fox Lair Avenue residence. She said that she did not see who perpetrated either shooting.

Memphis Police Department ("MPD") Officer Donal Cavette testified that he and his partner were patrolling together overnight on March 8-9, 2018, and that they received a call of "shots fired" at a Navaho Avenue residence. Upon arrival at approximately 2:00 a.m., Officer Cavette spoke with the victims and collected shell casings from the outside of the house. He said there were about ten people at the residence from "babies all the way to adults." Officer Cavette said that he took the shell casings to the MPD "Property and Evidence" room. Three or four hours after receiving the call to Navaho Avenue, he received another call for "shots fired" at a Fox Lair Avenue residence. He said that he and his partner arrived at approximately 6:00 a.m. and that some of the victims at Fox Lair Avenue had also been at the Navaho Avenue residence earlier that morning. Officer Cavette and his partner took the victims' statements and collected additional shell casings from outside the Fox Lair Avenue residence.

MPD Sergeant Robert Brown testified that he was the investigator for the shootings at Navaho Avenue and Fox Lair Avenue. He said that the only initial suspect was Co-Defendant Harris. Sergeant Brown recalled that he took Co-Defendant Harris's statement two days after the shootings and that he developed Defendant as a suspect. On cross-examination, Sergeant Brown agreed that he did not get a warrant to arrest Defendant and that he did not charge Defendant with any crime as a result of his investigation.

- 5 -

MPD Detective Marcus Walker testified that he worked with the gang unit in March of 2018 and that his team was tasked with taking an individual[2] into custody from a residence on Ridgecrest. Detective Walker said that his team detained all the individuals who were present at the Ridgecrest house, including Defendant, "for officer safety." He said that a weapon was found on the premises. On cross-examination, Detective Walker agreed that the weapon found on the premises could have belonged to any one of "six or eight" individuals at the Ridgecrest residence.

MPD Detective Jason Stewart testified that he worked with the gang unit and that he was present with Detective Walker when they detained Defendant at the Ridgecrest residence. He said that he found a black Ruger P89 9mm handgun outside the Ridgecrest property under a wooden deck.

MPD Officer Thomas "T.J." Ellis testified that he went to the scene at Ridgecrest in March 2018 to process evidence, including the Ruger P89 9mm handgun. He said that several other weapons were also recovered from the residence while he was at the scene.

Tennessee Bureau of Investigation ("TBI") Special Agent Kasia Lynch testified as an expert witness in firearms identification. She said that she examined seven shell casings from the Fox Lair Avenue residence and three shell casings from the Navaho Avenue residence. Agent Lynch stated that all ten shell casings were fired from the Ruger P89 9mm handgun which was recovered from the Ridgecrest residence.

On cross-examination, Agent Lynch explained that there was "a subjective nature to looking at the marks, and that is part of why our training is as long as it is[.]" She said that it was standard procedure for all cases in the firearms identification unit to be reviewed and verified by another "court qualified examiner." Agent Lynch said that her work in this case was reviewed by another agent. She agreed that there was no way for her to tell who shot the bullets or when the gun was shot.

Termeria Harris testified that she was nineteen years old and that she pled guilty in the present indictments. She said that she was not promised anything in return for her testimony at trial, and, at the time of trial, she had not been sentenced in the present case. Co-Defendant Harris said that she and Ms. Hammond used to be friends and that Ms. Hammond lived with her for a period of time. Co-Defendant Harris explained that, on the day rent was due, Ms. Hammond moved out instead of paying her share of the rent and that they had a physical altercation. She said that she and Ms. Hammond continued to argue over text and Facebook Messenger and that Ms. Hammond "busted out" her car windows.

---

[2] Detective Walker did not specify whom they were tasked with apprehending or the date on which they went to apprehend him or her.

Co-Defendant Harris called the police in March 2018 to report the vandalism. Co-Defendant Harris told Co-Defendant Lurry about the arguments with Ms. Hammond and the busted window. She said that she and Co-Defendant Lurry went to the Navaho Avenue residence where Ms. Hammond was staying because Co-Defendant Harris wanted to fight Ms. Hammond. They spoke with Ms. Bates there, and Co-Defendant Lurry told Ms. Bates that she had guns. Co-Defendant Harris testified that neither she nor Co-Defendant Lurry actually had a gun. Ms. Bates responded that Ms. Hammond was not home and that this was not her problem. Co-Defendant Harris said that Co-Defendant Lurry posted a video of their exchange with Ms. Bates on Facebook live.

Co-Defendant Harris testified that Co-Defendant Lurry informed her of someone named "Frank Grape" that could "shoot up the house," so they contacted "Frank Grape" over a video chat. Co-Defendant Harris stated that the man they spoke to by the name of "Frank Grape" was actually Defendant and that he said he would come get them from Co-Defendant Harris's house. Defendant arrived at Co-Defendant Harris's home at approximately midnight between March 8 and 9, 2018. She said that Defendant had "a black handgun, like with a long clip, like a little Glock or something like that."

Co-Defendant Harris testified that she, Co-Defendant Lurry, and Defendant drove to the Navaho Avenue residence, that she tried to stop Defendant from getting out of the car, but that "he said he ain't from the east so he don't give a damn who die." Co-Defendant Harris said that Defendant fired "like twelve shots" into the Navaho Avenue residence. She recalled that, afterwards, she, Co-Defendant Lurry, and Defendant drove around for a while and then drove to the Fox Lair Avenue residence. Co-Defendant Harris said that Defendant got out of the car and started shooting. Co-Defendant Harris said that she had been to both the Navaho Avenue residence and the Fox Lair Avenue residence before because she, Ms. Hammond, and Ms. Tyler had all been friends.

On cross-examination, Co-Defendant Harris agreed that, during the Facebook live video of March 8, 2018, she was standing next to Co-Defendant Lurry and that they were both "talking nasty" to Ms. Bates. Co-Defendant Harris said that, when she and Co-Defendant Lurry went to the Navaho Avenue residence, a friend of Co-Defendant Lurry's was in the car with them but that it was not Defendant. She denied that she wanted to "shoot up" the houses and said that Co-Defendant Lurry planned the shootings. She said that she thought she, Co-Defendant Lurry, and Defendant were going to the Navaho Avenue residence in the middle of the night just to fight. She said that it was just "a few minutes" between the two shootings at the two houses and that it was still dark when they arrived at Fox Lair Avenue.

Following deliberations, the jury found Defendant guilty of fifteen counts of facilitation of attempted second degree murder, fifteen counts of employing a firearm

during the commission of a dangerous felony, and two counts of facilitation of reckless endangerment.

*Sentencing Hearing*

Following argument of counsel, the trial court considered the statutory purposes and principles of sentencing. It found that Defendant was a Range I standard offender and said:

[T]he [c]ourt was very concerned after listening to those facts about the very violent nature of these two crimes. And the fact that in almost 40 years here I haven't seen something quite like this where a defendant was involved in - - in shooting up two houses in Memphis with a number of people that were potentially in the line of fire and subject to death.

Length of Sentences

In determining the sentence length for each of the counts for facilitation of attempted second degree murder, the trial court considered several enhancement factors. It noted that Defendant had a "record of arrests and convictions" and applied enhancement factor (1), that Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1) (2019). Because thirteen victims were involved, the trial court applied enhancement factor (3), that "[t]he offense involved more than one victim." Tenn. Code Ann. § 40-35-114(3) (2019). The trial court said that Defendant "possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense" and that factor (9) would apply because the employment of a firearm was not an element of facilitation of attempted second degree murder. Tenn. Code Ann. § 40-35-114(9) (2019). Finally the trial court considered factor (10), that Defendant "had no hesitation about committing a crime when the risk to human life was high[,]" and said that it "[could not] think of one that would fit that definition better than this case." Tenn. Code Ann. § 40-35-114(10) (2019). The trial court gave these enhancement factors "great weight." It found that no mitigating factors applied.

The trial court noted that the sentences for Defendant's convictions for employment of a firearm during the commission of a dangerous felony were statutorily required to be six years' incarceration and were to be served consecutive to each of his convictions for the underlying dangerous felonies. *See* Tenn. Code Ann. § 39-17-1324(e)(1), (h)(1) (2019). It said that Defendant was convicted of two misdemeanor facilitation of reckless endangerment counts and sentenced Defendant to eleven months and twenty-nine days' incarceration for each of those convictions.

- 8 -

## Sentence Pronounced by the Trial Court

The sentences pronounced by the trial court for each count in each case are as follows:

| Indictment No. | Count | Offense of Conviction | Sentence | Alignment[3] |
|---|---|---|---|---|
| 18-04092 | 1 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 counts 3, 11, 13, 15, 17, 19, and 21. Consecutive to 18-04092 counts 2, 4-10, 12, 14, 16, 18, 20, and all 18-04093 counts. |
| 18-04092 | 2 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 4, 6, 8, 10, 12, 14, 16, 18, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |
| 18-04092 | 3 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 counts 1, 11, 13, 15, 17, 19, and 21. Consecutive to 18-04092 counts 2, 4-10, 12, 14, 16, 18, 20, and all 18-04093 counts. |
| 18-04092 | 4 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 6, 8, 10, 12, 14, 16, 18, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |
| 18-04092 | 5 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 count 21. Consecutive to 18-04092 counts 1-4, 6-20, and all 18-04093 counts. |
| 18-04092 | 6 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 4, 8, 10, 12, 14, 16, 18, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |

---

[3] The alignment in this chart is based upon the trial court's pronouncement at sentencing. In several counts, the judgment forms included in the record do not correctly reflect the trial court's pronouncement.

| 18-04092 | 7 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 count 21. Consecutive to 18-04092 counts 1-6, 8-20, and all 18-04093 counts. |
|---|---|---|---|---|
| 18-04092 | 8 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 4, 6, 10, 12, 14, 16, 18, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |
| 18-04092 | 9 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 count 21. Consecutive to 18-04092 counts 1-8, 10-20, and all 18-04093 counts. |
| 18-04092 | 10 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 4, 6, 8, 12, 14, 16, 18, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |
| 18-04092 | 11 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 count 1, 3, 13, 15, 17, 19, 21. Consecutive to 18-04092 counts 2, 4-10, 12, 14, 16, 18, 20, and all 18-04093 counts. |
| 18-04092 | 12 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 4, 6, 8, 10, 14, 16, 18, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |
| 18-04092 | 13 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 counts 1, 3, 11, 15, 17, 19, and 21. Consecutive to 18-04092 counts 2, 4-10, 12, 14, 16, 18, 20, and all 18-04093 counts. |

| | | | | |
|---|---|---|---|---|
| 18-04092 | 14 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 4, 6, 8, 10, 12, 16, 18, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |
| 18-04092 | 15 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 counts 1, 3, 11, 13, 17, 19, and 21. Consecutive to 18-04092 counts 2, 4-10, 12, 14, 16, 18, 20 and all 18-04093 counts. |
| 18-04092 | 16 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 4, 6, 8, 10, 12, 14, 18, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |
| 18-04092 | 17 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 counts 1, 3, 11, 13, 15, 19, and 21. Consecutive to 18-04092 counts 2, 4-10, 12, 14, 16, 18, 20, and all 18-04093 counts. |
| 18-04092 | 18 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 4, 6, 8, 10, 12, 14, 16, 20, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |
| 18-04092 | 19 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04092 counts 1, 3, 11, 13, 15, 17, and 21. Consecutive to 18-04092 counts 2, 4-10, 12, 14, 16, 18, 20, and all 18-04093 counts. |
| 18-04092 | 20 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04092 counts 2, 4, 6, 8, 10, 12, 14, 16, 18, and 21. Consecutive to 18-04092 counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, and all 18-04093 counts. |

| 18-04092 | 21 | facilitation of reckless endangerment | 11 months 29 days | Concurrent with 18-04092 counts 1-20; consecutive to all 18-04093 counts. |
|---|---|---|---|---|
| 18-04093 | 1 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04093 counts 3, 5, and 11. Consecutive to 18-04093 counts 2, 4, 6-10, and all 18-04092 counts. |
| 18-04093 | 2 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04093 counts 4, 10, and 11. Consecutive to 18-04093 counts 1, 3, 5, 6, 7, 8,9, and all 18-04092 counts. |
| 18-04093 | 3 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04093 counts 1, 5, and 11. Consecutive to 18-04093 counts 2, 4, 6-10, and all 18-04092 counts. |
| 18-04093 | 4 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04093 counts 2, 10, and 11. Consecutive to 18-04093 counts 1, 3, 5, 6, 7, 8, 9, and all 18-04092 counts. |
| 18-04093 | 5 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04093 counts 1, 3, and 11. Consecutive to 18-04093 counts 2, 4, 6-10, and all 18-04092 counts. |
| 18-04093 | 6 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04093 counts 2, 4, 10, and 11. Consecutive to 18-04093 counts 1, 3, 5, 7, 8, 9, and all 18-04092 counts. |
| 18-04093 | 7 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04093 count 11. Consecutive to 18-04093 counts 1-6, 8-10, and all 18-04092 counts. |
| 18-04093 | 8 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04093 counts 2, 4, 10, and 11. Consecutive to 18-04093 counts 1, 3, 5, 6, 7, 9, and all 18-04092 counts. |

| 18-04093 | 9 | facilitation of attempted second degree murder | 6 years | Concurrent with 18-04093 count 11. Consecutive to 18-04093 counts 1-8, 10, and all 18-04092 counts. |
|---|---|---|---|---|
| 18-04093 | 10 | employing a firearm during the commission of a dangerous felony | 6 years | Concurrent with 18-04093 counts 2, 4, 6, 8, and 11. Consecutive to 18-04093 counts 1, 3, 5, 7, 9, and all 18-04092 counts. |
| 18-04093 | 11 | facilitation of reckless endangerment | 11 months 29 days | Concurrent with 18-04093 counts 1-10; consecutive to all 18-04092 counts. |

The trial court found that consecutive sentencing was appropriate because Defendant was a "dangerous offender" and said that "the circumstances surrounding the commission of the offense are aggravated" and that "the aggregate length of sentence [] reasonably relates to the offense for which the defendant stands convicted." *See* Tenn. Code Ann. § 40-35-115(b)(4) (2019).

In Case No. 18-04092, the trial court pronounced that it was aligning seven of the ten facilitation of attempted second degree murder convictions concurrently and the other three convictions[4] consecutively to the seven concurrent convictions and to each other for a total effective sentence of twenty-four years. The trial court ran all ten firearm convictions concurrent with each other, for a total effective sentence of six years, but consecutive to the ten facilitation of attempted second degree murder convictions. The trial court ran the facilitation of reckless endangerment conviction concurrent with all counts. Thus, the total effective sentence in Case No. 18-04092 was thirty years.

In Case No. 18-04093, the trial court ran three of the five facilitation of attempted second degree murder convictions concurrent with each other and ran the other two convictions[5] consecutive to the three concurrent convictions and to each other for a total effective sentence of eighteen years. The trial court stated that it would run firearm counts 6 and 8[6] consecutive to firearm counts 2 and 4 for a total effective sentence of twelve

---

[4] Although the trial court noted that it wanted to run sentences for the minor victims consecutively, it ran consecutively count 5 involving Ashley Moore, who was an adult. Further, the trial court ran Case No. 18-04092 counts 17 and 19 concurrently, even though counts 17 and 19 involved minors.

[5] Case No. 18-04093 counts 7 and 9 were run consecutive to each other and to the three concurrent counts. Counts 7 and 9 involved Ms. Tyler's minor children, victims C.T.1 and C.T.2.

[6] The trial court stated:

years.[7] The trial court ran the facilitation of reckless endangerment conviction concurrent with all counts. Thus, the total effective sentence in Case No. 18-04093 was thirty years. The trial court aligned the two cases consecutively, for a total effective sentence of sixty years.

## Sentences in Judgment Forms

The "special conditions" section of thirty-one judgment forms have a handwritten notation stating that the total effective sentence is fifty-four years and that the motion for new trial was overruled on February 21, 2020. These thirty-one judgments were signed by the trial court on December 9, 2019.[8] The "corrected" judgment form in count 2 of Case No. 18-04093 has the same notation, but it is typed, and the judgment was signed by the trial court on July 1, 2020.

## Motion for New Trial and Appeal

Defendant filed a motion for new trial and an amended motion for new trial which were heard on February 21, 2020. Trial counsel stated during the hearing that "the court sentenced [Defendant] to a net effective of 60 years[.]" After argument, the trial court stated that he had heard "nothing that has changed the [c]ourt's mind" and that "the [c]ourt feels that the sentences were appropriate based on [D]efendant's conduct and the seriousness of this particular offense as well as the enhancement factors that were present and the lack of mitigating factors." The court denied the motion for new trial and Defendant timely appealed.

## **Analysis**

---

Counts Six and Eight will be consecutive to [c]ounts Two and Four, and they'll be consecutive to 18-04092 and 18-04093 [c]ounts One, Three, Five, Seven, Nine. So by my calculations he'll have a total sentence of 30 years in 18-04092 and 30 years in 18-04093 and they'll be served.

The trial court did not verbally state whether it wanted to run counts 6 and 8 concurrent with or consecutive to count 10; however, per the judgment form for count 10, it appears the trial court intended count 10 to run concurrent with counts 2 and 4 and consecutive to counts 6 and 8.

[7] Despite the pronouncement of the trial court, the judgment sheets indicate that all the firearm counts were run concurrent with each other but consecutive to the facilitation of attempted second degree murder convictions. We will address this later in the opinion.

[8] Although the trial court announced at the sentencing hearing that the total effective sentence was "sixty" years, both the State and Defendant on appeal state that the total effective sentence is fifty-four years.

- 14 -

On appeal, Defendant argues that the evidence was insufficient to support his convictions and that the trial court erred in imposing partial consecutive sentencing.

*Sufficiency of the Evidence*

Standard of Review

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Employing a Firearm During the Commission of a Dangerous Felony;
Underlying Dangerous Felony: Attempted Second Degree Murder

Defendant argues that the evidence was insufficient to sustain his convictions for employment of a firearm during the commission of a dangerous felony because the "plain language of the statute does not enumerate facilitation as a dangerous felony." The State responds that the underlying felony chosen by the jury was attempted second degree murder and that the inconsistent verdicts are permissible.

Defendant argues on appeal:

[Defendant] acknowledges *State v.* [*Joshua*] *Johnson*, [No. E2015-00545-CCA-R3-CD, 2016 WL 297886, at *6 (Tenn. Crim. App. Jan. 25, 2016), *perm. app. denied* (Tenn. June 23, 2016)], a case in which this [c]ourt held that evidence was sufficient to convict a defendant of employing a firearm

during the commission of a dangerous felony when the underlying felony the defendant was convicted of was facilitating attempted first degree murder. However, this [c]ourt in its opinion, only addressed the issue in regards to the jury verdicts seemingly being inconsistent. In [*Joshua*] *Johnson*, this [c]ourt ultimately held that the facts supported the defendant's conviction and that the inconsistent verdicts were allowed. However, in the present case, [Defendant] contends that his conviction contradicts the plain statutory language of the statute he was convicted under and does not challenge his conviction on grounds that the jury's verdict is inconsistent.

However, in this case, the jury did not select "facilitation of attempted second degree murder" as the underlying dangerous felony. The jury selected "criminal attempt second degree murder" as the underlying dangerous felony. Since the jury selected a statutorily enumerated offense for the underlying dangerous felony, Defendant's argument that the conviction violates the plain language of the statute has no merit. *See* Tenn. Code Ann. § 39-17-1324(i)(1) (2018). Therefore, we will consider the issue as one of inconsistent verdicts.

"[C]onsistency between verdicts on separate counts of an indictment is not necessary." *State v. Davis*, 466 S.W.3d 49, 76 (Tenn. 2015). "[T]his court has found on multiple occasions that a conviction for employing a firearm during the commission of a dangerous felony can stand despite acquittal of the dangerous felony." *State v. Jonquarius Cunningham*, No. W2016-00065-CCA-R3-CD, 2017 WL 3616667, at *6 (Tenn. Crim. App. Aug. 23, 2017). Our only inquiry when presented with inconsistent verdicts is the sufficiency of the evidence of the convicted offense. *State v. Tony Scott Walker*, No. 02C01-9704-CC-00147, 1997 WL 746433, at *5 (Tenn. Crim. App. Dec. 3, 1997). Thus, we will examine whether the evidence was sufficient to support the convictions of both employing a firearm and of the underlying felony chosen by the jury -- attempted second degree murder.

"It is an offense to employ a firearm or antique firearm during the [c]ommission of a dangerous felony [or the] [a]ttempt to commit a dangerous felony[.]" Tenn. Code Ann. § 39-17-1324(b)(1), (2) (2018). As pertinent here, "dangerous felony" includes attempted second degree murder. Tenn. Code Ann. § 39-17-1324(i)(1)(B) (2018).

Second degree murder is "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2018). Second degree murder is a "result of conduct" offense. *See State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to

cause the result." Tenn. Code Ann. § 39-11-302(b) (2018). In other words, "the State is not required to prove that Defendant wished to cause his victim's death but only that Defendant knew that his or her actions were reasonably certain to cause the victim's death." *Brown*, 311 S.W.3d at 432.

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) [i]ntentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2018).

Viewed in the light most favorable to the State, the evidence established that Defendant employed a firearm during an attempt to commit a knowing killing of the occupants of the Navaho Avenue residence and the Fox Lair Avenue residence. At the behest of Co-Defendant Harris, Defendant arrived at Co-Defendant Harris's home to assist with her feud with Ms. Hammond, and Defendant brought a gun. Defendant and Co-Defendants Harris and Lurry then drove to the Navaho Avenue residence in the middle of the night. Defendant told Co-Defendant Harris that "he don't give a damn who die," and both Mr. Bates and Co-Defendant Harris testified that Defendant shot twelve times into the Navaho Avenue residence. Then the three co-defendants drove to the Fox Lair Avenue residence, where Defendant shot several more bullets into that home. Ms. Hammond testified that she heard "at least five" shots fired at the Fox Lair Avenue residence. Three shell casings were recovered outside the Navaho Avenue residence, and seven shell casings were recovered outside the Fox Lair Avenue residence. Photographs of the houses show damage in multiple rooms and windows, sometimes inches from where the victims lay sleeping. Mr. Bates identified nine separate bullet holes through the windows of his home and multiple bullet holes in his walls. Moreover, officers found Defendant at the same location where they found the weapon used in the shootings. Thus, the evidence was sufficient to support Defendant's fifteen convictions for employing a firearm during the

attempt to commit second degree murder.  *See e.g.*, *Joshua Johnson*, 2016 WL 297886, at *6 (finding sufficient evidence where the defendant was convicted of *facilitation* of attempted first degree murder, and the defendant was convicted of employing a firearm during the commission of a dangerous felony with the underlying felony of attempted first degree murder); *State v. Rickie Reed*, No. W2001-02076-CCA-R3-CD, 2002 WL 31443196, at *6 (Tenn. Crim. App. Oct. 31, 2002) (finding sufficient evidence for attempted second degree murder where a defendant shot into a house), *perm. app. denied* (Tenn. Mar. 17, 2003); *State v. Thomas J. Faulkner Jr.*, No. E2000-00309-CCA-R3-CD, 2001 WL 378540, at *9 (Tenn. Crim. App. Apr. 17, 2001) (concluding that the evidence was sufficient to support the defendant's convictions of four counts of attempted first degree murder where there were four people in a home and the defendant fired "multiple shots" into the home, stating that "[i]t matters not that [the defendant] was unaware of the identity of each individual or even the exact number of individuals present" in the home because he "had the conscious objective to kill as many people as necessary").

### Facilitation of Attempted Second Degree Murder

In the same way, the evidence supported the jury's verdicts for the lesser included offense of facilitation of attempted second degree murder in fifteen of the counts.  "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony."  Tenn. Code Ann. § 39-11-403(a) (2018).  By shooting his gun into the two residences and attempting knowing killings, as explained above, Defendant furnished more than substantial assistance to Co-Defendant Harris in the commission of attempted second degree murder.

### Corroboration of Accomplice Testimony

Defendant also asserts that the evidence was insufficient to sustain any of his convictions because the testimony of Co-Defendant Harris "was not sufficiently corroborated."

It is well-established in Tennessee case law that "a conviction may not be based upon the uncorroborated testimony of an accomplice."  *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citing *Monts v. State*, 379 S.W.2d 34, 43 (1964); *Stanley v. State*, 222 S.W.2d 384 (1949)), *superseded on other grounds by statute*.  An accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime."  *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004); *Clapp v. State*, 30 S.W. 214, 216 (1895)).  A witness is an accomplice of the defendant if "the alleged accomplice could be indicted for

the same offense charged against the defendant." *Id.* (quoting *Monts*, 379 S.W.2d at 43). "Whether a witness' testimony has been sufficiently corroborated is a matter entrusted to the jury as the trier of fact." *Bigbee*, 885 S.W.2d at 803. Our supreme court has described the amount of evidence needed to corroborate an accomplice's testimony as the following:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Id.* (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). "[O]nly slight circumstances are required to corroborate an accomplice's testimony." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997) (internal citations omitted). However, "[e]vidence which merely casts a suspicion on the [defendant] or establishes [that the defendant] had an opportunity to commit the crime in question" and "evidence that the accused was present at the [location] of the crime" is insufficient to corroborate an accomplice's testimony. *Id.* (citing *Bolton v. State*, 377 S.W.2d 936, 939 (Tenn. 1964); *Mathis v. State*, 590 S.W.2d 449, 455 (Tenn. 1979)). "Where there are multiple accomplices there must be additional corroboration, since accomplices cannot corroborate each other." *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995) (citing *Bethany v. State*, 565 S.W.2d 900 (Tenn. Crim. App. 1978)); *see also State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001).

Here, that the weapon used in the shootings was recovered at the same location where Defendant was arrested corroborated Co-Defendant Harris's accomplice testimony. Co-Defendant Harris said that Defendant had "a black handgun" when he arrived at her house, and Detective Stewart testified that the handgun recovered from the Ridgecrest residence was a black Ruger P89 9mm handgun. Moreover, Agent Lynch confirmed that the Ruger P89 9mm handgun matched the bullets recovered at both shooting locations. These facts "tend to connect [D]efendant with the commission of the offense." *Bigbee*,

885 S.W.2d at 803. We conclude that there was sufficient corroboration of the accomplice testimony. Defendant is not entitled to relief.

<u>Facilitation of Reckless Endangerment</u>

Finally, concerning the sufficiency of the evidence, we will consider Defendant's two facilitation of reckless endangerment convictions. Here, the two indictments for reckless endangerment charged that Defendant

> did unlawfully and recklessly, by use of a deadly weapon, engage in conduct which placed occupants of [the Fox Lair Avenue residence/the Navaho Avenue residence] in imminent danger of death or serious bodily injury by discharging a weapon into an occupied habitation, in violation of T[ennessee] C[ode] A[nnotated §] 39-13-103[.]

When the trial court instructed the jury on "reckless endangerment with a deadly weapon," it listed the following elements for the State to prove beyond a reasonable doubt:

> (1) That [D]efendant, or one for whom [D]efendant is criminally responsible, engaged in conduct which placed or might have placed another person in imminent danger of death or serious bodily injury; and

> (2) that [D]efendant acted recklessly; and

> (3) that the offense was committed with a deadly weapon; and

> (4) that [D]efendant discharged a firearm into an occupied habitation.

The jury verdict form for Case No. 18-04092[9] count 21 did not include a box for the jury to find Defendant guilty of Class C felony reckless endangerment with a deadly weapon by discharging a firearm into an occupied inhabitation. The first box on the verdict form read: "We the Jury find [D]efendant guilty of Reckless Endangerment with a Deadly Weapon, as charged in Count Twenty-One." The jury left this box blank and checked the next box which read: "We the Jury find [D]efendant guilty of Facilitation of Reckless Endangerment with a Deadly Weapon, as included in Count Twenty-One."

At the sentencing hearing, the trial court said:

---

[9] The verdict forms for Case No. 18-04093 were not included on appeal.

[Defendant] was also convicted of facilitation to commit reckless endangerment, which is a misdemeanor in both counts -- both [i]ndictments, and the [c]ourt will sentence him to 11 months and 29 days on each of those misdemeanors.

The trial court viewed the verdict provided by the jury as a Class A misdemeanor. Viewed in the light most favorable to the State, the evidence supports Defendant's convictions for facilitation of reckless endangerment with a deadly weapon, a Class A misdemeanor.

*Consecutive Sentencing*

Defendant argues that the trial court's decision to impose consecutive sentences is not entitled to deference because the trial court failed to make the appropriate findings on the record pursuant to *State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). He asserts that consecutive sentencing did not relate to the severity of the offenses because no one was injured and because he was "only convicted of facilitating the felony[.]" Defendant contends that consecutive sentencing was not necessary to protect the public from further crimes.

The State responds that the trial court's reliance on the Strong R assessment score was an implicit finding that consecutive sentences were necessary to protect the public from Defendant's "high risk of violence." The State contends that the trial court addressed the "severity of the offenses" when it made findings, during its discussion on the length of the sentences, that the crimes were of a "very violent nature" and that Defendant "[shot] up two houses in Memphis with a number of people that were potentially in the line of fire and subject to death." In the alternative, the State argues that this court can affirm the trial court's decision via a de novo review.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2014), Sentencing Comm'n Cmts. To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2014); *Bise*, 380 S.W.3d at 706. In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013).

Tennessee Code Annotated section 40-35-115 sets forth seven different situations in which a trial court may impose consecutive sentencing, including when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4); *see Wilkerson*, 905 S.W.2d at 936. Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. In order to limit the use of the "dangerous offender" category to cases where it is warranted, our supreme court has stated that the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In *Pollard*, our supreme court found that a mere recitation of the *Wilkerson* factors was insufficient. *Pollard*, 432 S.W.3d at 855. The court explained:

> Where, as here, the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority. Faced with this situation, the appellate court has two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences.

*Id*. at 863-864.

In the present case, to support its decision to run some of the facilitation of attempted second degree murder convictions consecutively, the trial court found that Defendant was a dangerous offender and said:

> Primarily because the facts of this particular case, but also the Strong R Assessment that was made [in] his [p]resentence [r]eport, [] the finding was of high risk for violence. . . .
>
> My intention is in looking at the way those sentences are to be served that I do find [D]efendant is a dangerous offender whose behavior indicates little to no regard for human life and no hesitation about committing a crime which human -- risk of human high -- life is high; and that the circumstances surrounding the commission of the offense are aggravated; and that the

- 22 -

aggregate length of sentence reasonably related to the offenses of which the defendant stands convicted.  So I think aggregation in this case is warranted.

The trial court did not explicitly state the *Wilkerson* factors.  *See Wilkerson*, 905 S.W.2d at 939.  However, in finding that Defendant was a dangerous offender, the trial court noted that Defendant's Strong R Assessment showed that he had a high risk of violence, implicitly finding that "an extended sentence is necessary to protect the public against further criminal conduct[.]"  *Id*; *see also State v. DeMarco Waters*, No. W2015-01366-CCA-R3-CD, 2016 WL 4250146, at \*6 (Tenn. Crim. App. Aug. 10, 2016) ("Although the trial court did not make an explicit finding that the length of sentence was necessary in order to protect the public from further criminal acts by the defendant, such finding was implicit in its ruling."), *perm. app. denied* (Tenn. Oct. 21, 2016).  It also said that it had not seen a case quite like this where a defendant shot up two houses in one night with multiple people in each home "subject to death," thus implicitly finding that consecutive sentencing "reasonably relate[d] to the severity of the offenses committed." *See Wilkerson*, 905 S.W.2d at 939.

In any event, even if the trial court erred in finding Defendant to be a dangerous offender, consecutive sentencing was proper because Defendant had an extensive record of criminal activity given his present convictions.  *See State v. David Richardson*, No. W2016-00174-CCA-R3-CD, 2017 WL 401368, at \*9 (Tenn. Crim. App. Jan. 27, 2017) (finding that the trial court did not abuse its discretion in imposing consecutive sentencing because the trial court could have applied the extensive criminal history factor, even though it did not), *perm. app. denied* (Tenn. May 24, 2017).  Not only does Defendant have a long history of drug use and misdemeanor convictions, "current offenses may be used in determining criminal history for the purposes of consecutive sentencing."  *State v. Branham*, 501 S.W.3d 577, 596 (Tenn. Crim. App. 2016) (internal citations omitted). Defendant was convicted of thirty felonies in the present case.  That is more than sufficient to establish an extensive record of criminal activity, thus supporting consecutive sentencing.  Tenn. Code Ann. § 40-35-115(b)(2) (2019).  We conclude that the trial court did not abuse its discretion in applying consecutive sentencing.

*Discrepancies Between the Pronounced Sentences and the Sentences in the Judgments*

While neither party raised these issues on appeal, several discrepancies arise from the record.  Foremost is the length of the sentence.  The trial court stated that it sentenced the Defendant to an effective sentence of sixty years (thirty years in each case running consecutively).  The judgments show an effective sentence of fifty-four years (thirty years in Case No. 18-04092 and twenty-four years in Case No. 18-04093).  The judgment forms for employing a firearm during the commission of a dangerous felony in Case No. 18-04093 (counts 2, 4, 6, 8, and 10) indicate that the six-year sentences ran concurrently.  This

- 23 -

alignment would result in a total effective sentence of twenty-four years for Case 18-04093 (eighteen years in the facilitation of attempted second degree murder counts and six years in the employing a firearm during the commission of a dangerous felony counts). At the sentencing hearing, the trial court stated that counts 6 and 8 of Case No. 18-04093 were to be consecutively to counts 2 and 4 of Case No. 18-04093. If the trial court intended to align counts 6 and 8 concurrently with each other, but consecutively to counts 2, 4, and 10; then the effective sentence for Case No. 18-04093 would be thirty years, not twenty-four years, and the total effective sentence for Case No. 18-04092 and Case No. 18-04093 would be sixty years, not fifty-four years. The trial court signed thirty-one of the verdict forms on December 9, 2019, months before someone handwrote in the special conditions box of the verdict forms that the motion for new trial was heard and overruled on February 21, 2020. The clerk filed the verdict forms the same day. Based on the record, there is no way for this court to know by whom or when "Total Effective 54 yrs" was handwritten in the special conditions box of the thirty-one verdict forms. The "corrected" verdict form for Count 2 of Case 18-04093 was signed by the trial court on July 1, 2020, and filed by the clerk on the same day. The count 2 corrected verdict form in Case No. 18-04092 has typed in the special conditions box: "TOTAL EFFECTIVE SENTENCE OF 54 YEARS" and "MNT HEARD AND OVERRULED 02/21/2020."

Second, the judgment forms for the facilitation of attempted second degree murder counts do not reflect the consecutive alignment to the firearms counts, as pronounced at sentencing.

Finally, the judgment forms in both facilitation of reckless endangerment counts do not reflect consecutive alignment with the counts in the alternate case number.

## Conclusion

We remand Case No. 18-04092 count 21 for entry of judgments reflecting consecutive alignment with Case No. 18-04093 and we remand Case No. 18-04093 count 11 for entry of judgments reflecting consecutive alignment with Case No. 18-04092. Further, we remand Count 6 and 8 of Case No. 18-04093 for the court to determine whether those two counts were to be concurrent with each other but consecutive to counts 2, 4, 10 in Case No. 18-04093 or if all five counts were concurrent. If on remand, the trial court determines that counts 6 and 8 in Case No. 18-04093 are concurrent with each other and consecutive to the counts 2, 4, and 10, then the total effective sentence would be sixty-years, not fifty-four years, and all judgment forms need to be corrected to delete the fifty-four-year sentence reference in the special conditions box. Finally, we remand all facilitation of attempted second degree murder counts for amendment of the judgment forms to reflect consecutive alignment with all counts in the other case. We affirm the

- 24 -

judgments of conviction but remand this matter for the trial court to correct the inconsistencies concerning the sentence.

_____

ROBERT L. HOLLOWAY, JR., JUDGE